# United States Court of Appeals
## For the First Circuit

No. 16-1901

KEVIN O'CONNOR; CHRISTOPHER O'CONNOR; JAMES ADAM COX; MICHAEL
FRASER; ROBERT MCNALLY,

Plaintiffs, Appellants,

v.

OAKHURST DAIRY; DAIRY FARMERS OF AMERICA, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, Chief U.S. District Judge]

Before

Lynch, Lipez, and Barron,
Circuit Judges.

David G. Webbert, with whom Jeffrey Neil Young, Carol J.
Garvan, and Johnson, Webbert, and Young, LLP were on brief, for
appellants.
David L. Schenberg, with whom Patrick F. Hulla and
Ogletree, Deakins, Nash, Smoak and Stewart, P.C. were on brief,
for appellees.

March 13, 2017

**BARRON**, <u>Circuit Judge</u>. For want of a comma, we have this case. It arises from a dispute between a Maine dairy company and its delivery drivers, and it concerns the scope of an exemption from Maine's overtime law. 26 M.R.S.A. § 664(3). Specifically, if that exemption used a serial comma to mark off the last of the activities that it lists, then the exemption would clearly encompass an activity that the drivers perform. And, in that event, the drivers would plainly fall within the exemption and thus outside the overtime law's protection. But, as it happens, there is no serial comma to be found in the exemption's list of activities, thus leading to this dispute over whether the drivers fall within the exemption from the overtime law or not.

The District Court concluded that, despite the absent comma, the Maine legislature unambiguously intended for the last term in the exemption's list of activities to identify an exempt activity in its own right. The District Court thus granted summary judgment to the dairy company, as there is no dispute that the drivers do perform that activity. But, we conclude that the exemption's scope is actually not so clear in this regard. And because, under Maine law, ambiguities in the state's wage and hour laws must be construed liberally in order to accomplish their remedial purpose, we adopt the drivers'

narrower reading of the exemption.  We therefore reverse the grant of summary judgment and remand for further proceedings.

## I.

Maine's wage and hour law is set forth in Chapter 7 of Title 26 of the Maine Revised Statutes.  The Maine overtime law is part of the state's wage and hour law.

The overtime law provides that "[a]n employer may not require an employee to work more than 40 hours in any one week unless 1 1/2 times the regular hourly rate is paid for all hours actually worked in excess of 40 hours in that week."  26 M.R.S.A. § 664(3).  The overtime law does not separately define the term, "employee."  Instead, it relies on the definition of "employee" that the Chapter elsewhere sets forth.

That definition, which applies to the Chapter as a whole, provides that an "employee" is "any individual employed or permitted to work by an employer," id. at § 663(3). However, the definition expressly excludes a few categories of workers who are specifically defined not to be "employee[s]," id. at § 663(3)(A)-(L).

The delivery drivers do not fall within the categories of workers excluded from the definition.  They thus are plainly "employees."  But some workers who fall within the statutory definition of "employee" nonetheless fall outside the protection of the overtime law due to a series of express exemptions from

- 3 -

that law.  The exemption to the overtime law that is in dispute here is Exemption F.

Exemption F covers employees whose work involves the handling -- in one way or another -- of certain, expressly enumerated food products.  Specifically, Exemption F states that the protection of the overtime law does not apply to:

> The canning, processing, preserving, freezing, drying, marketing, storing, packing for shipment or distribution of:
>     (1) Agricultural produce;
>     (2) Meat and fish products; and
>     (3) Perishable foods.

26 M.R.S.A. § 664(3)(F).  The parties' dispute concerns the meaning of the words "packing for shipment or distribution."

The delivery drivers contend that, in combination, these words refer to the single activity of "packing," whether the "packing" is for "shipment" or for "distribution."  The drivers further contend that, although they do handle perishable foods, they do not engage in "packing" them.  As a result, the drivers argue that, as employees who fall outside Exemption F, the Maine overtime law protects them.

Oakhurst responds that the disputed words actually refer to two distinct exempt activities, with the first being "packing for shipment" and the second being "distribution."  And because the delivery drivers do -- quite obviously -- engage in the "distribution" of dairy products, which are "perishable

foods," Oakhurst contends that the drivers fall within Exemption F and thus outside the overtime law's protection.

The delivery drivers lost this interpretive dispute below. They had filed suit against Oakhurst on May 5, 2014 in the United States District Court for the District of Maine. The suit sought unpaid overtime wages under the federal Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq., and the Maine overtime law, 26 M.R.S.A. § 664(3).[1] The case was referred to a Magistrate Judge, and the parties filed cross-motions for partial summary judgment to resolve their dispute over the scope of Exemption F. After hearings on those motions, the Magistrate Judge ruled that Oakhurst's reading of Exemption F was the better one and recommended granting Oakhurst's motion. The District Court agreed with the Magistrate Judge's recommendation and granted summary judgment for Oakhurst on the ground that "distribution" was a stand-alone exempt activity.[2]

---

[1] The delivery drivers also made claims based on other provisions of Maine wage and hour law. 26 M.R.S.A. § 621-A (timely and full payment of wages); id. § 626 (payment of wages after cessation of employment); id. § 626-A (penalties provisions). These claims appear to rise or fall based on the success of the overtime claim, so we do not consider them separately.

[2] After granting Oakhurst's motion for partial summary judgment on the meaning of Exemption F, the District Court dismissed all of plaintiffs' state law claims. At the same time, the federal claims were all dismissed without prejudice. As a result, we have appellate jurisdiction over the District Court's order under 28 U.S.C. § 1291.

The delivery drivers now appeal that ruling. They raise a single legal question: what does the contested phrase in Exemption F mean? Our review on this question of state law interpretation is de novo. See Manchester Sch. Dist. v. Crisman, 306 F.3d 1, 9 (1st Cir. 2002).

II.

The issue before us turns wholly on the meaning of a provision in a Maine statute. We thus first consider whether there are any Maine precedents that construe that provision.

Oakhurst identifies one: the Maine Superior Court's unpublished opinion in Thompson v. Shaw's Supermarkets, Inc., No. Civ. A. CV-02-036, 2002 WL 31045303 (Me. Sup. Ct. Sept. 5, 2002). In that case, the Superior Court ruled that Exemption F "is clear that an exemption exists for the distribution of the three categories of foods," id. at *3, as a matter of both text and purpose, id. at *2.

But, a Superior Court decision construing Maine law would not bind the Maine Law Court, and thus does not bind us. See generally King v. Order of United Commercial Travelers of Am., 333 U.S. 153, 159-62 (1948) (rejecting an unreported state trial court decision as binding on federal courts); Keeley v. Loomis Fargo & Co., 183 F.3d 257, 269 n.9 (3d Cir. 1999) (finding a state trial court decision to be "at most persuasive but nonbinding authority," with the federal court instead

"look[ing] to the plain language of the statute and our own interpretation . . . in predicting how the state supreme court" would rule).  Moreover, the Superior Court's decision in Thompson was appealed to the Maine Law Court, which declined to follow the Superior Court's approach and instead decided the case on different grounds altogether.  See Thompson v. Shaw's Supermarkets, Inc., 847 A.2d 406, 409 (Me. 2004).

Nevertheless, the reasons that the Superior Court decision in Thompson gave -- even if not adopted by the Maine Law Court -- figure prominently in the arguments that Oakhurst now presents to us on appeal.  We thus consider those reasons in the course of our analysis, to which we now turn.

### III.

Each party recognizes that, by its bare terms, Exemption F raises questions as to its scope, largely due to the fact that no comma precedes the words "or distribution."  But each side also contends that the exemption's text has a latent clarity, at least after one applies various interpretive aids. Each side then goes on to argue that the overtime law's evident purpose and legislative history confirms its preferred reading.

We conclude, however, that Exemption F is ambiguous, even after we take account of the relevant interpretive aids and the law's purpose and legislative history.  For that reason, we conclude that, under Maine law, we must construe the

exemption in the narrow manner that the drivers favor, as doing so furthers the overtime law's remedial purposes. See Dir. of Bureau of Labor Standards v. Cormier, 527 A.2d 1297 (Me. 1987). Before explaining our reasons for reaching this conclusion, though, we first need to work our way through the parties' arguments as to why, despite the absent comma, Exemption F is clearer than it looks.

### A.

First, the text. See Harrington v. State, 96 A.3d 696, 697-98 (Me. 2014) ("Only if the statute is reasonably susceptible to different interpretations will we look beyond the statutory language . . . ."). In considering it, we do not simply look at the particular word "distribution" in isolation from the exemption as a whole. We instead must take account of certain linguistic conventions -- canons, as they are often called -- that can help us make sense of a word in the context in which it appears. Oakhurst argues that, when we account for these canons here, it is clear that the exemption identifies "distribution" as a stand-alone, exempt activity rather than as an activity that merely modifies the stand-alone, exempt activity of "packing."

Oakhurst relies for its reading in significant part on the rule against surplusage, which instructs that we must give independent meaning to each word in a statute and treat none as

unnecessary.  See Stromberg-Carlson Corp. v. State Tax Assessor,
765 A.2d 566, 569 (Me. 2001) ("When construing the language of a
statute . . . [w]ords must be given meaning and not treated as
meaningless and superfluous.").  To make this case, Oakhurst
explains that "shipment" and "distribution" are synonyms.  For
that reason, Oakhurst contends, "distribution" cannot describe a
type of "packing," as the word "distribution" would then
redundantly perform the role that "shipment" -- as its synonym -
- already performs, which is to describe the type of "packing"
that is exempt.  See Thompson, 2002 WL 31045303 at *2 ("[I]t is
not at all clear how packing for shipment would be different
from packing for distribution.").  By contrast, Oakhurst
explains, under its reading, the words "shipment" and
"distribution" are not redundant.  The first word, "shipment,"
describes the exempt activity of "packing," while the second,
"distribution," describes an exempt activity in its own right.

Oakhurst also relies on another established linguistic
convention in pressing its case -- the convention of using a
conjunction to mark off the last item on a list.  See The
Chicago Manual of Style § 6.123 (16th ed. 2010) (providing
examples of lists with such conjunctions).  Oakhurst notes,
rightly, that there is no conjunction before "packing," but that
there is one after "shipment" and thus before "distribution."
Oakhurst also observes that Maine overtime law contains two

other lists in addition to the one at issue here and that each
places a conjunction before the last item.  <u>See</u> 26 M.R.S.A. §
664(3) ("The regular hourly rate includes all earnings, bonuses,
commissions <u>and</u> other compensation . . ." (emphasis added)); <u>id.</u>
at § 664(3)(A) (exempting from overtime law "automobile
mechanics, automobile parts clerks, automobile service writers
<u>and</u> automobile salespersons as defined in section 663" (emphasis
added)).

     Oakhurst acknowledges that its reading would be beyond
dispute if a comma preceded the word "distribution" and that no
comma is there.  But, Oakhurst contends, that comma is missing
for good reason.  Oakhurst points out that the Maine Legislative
Drafting Manual expressly instructs that: "when drafting Maine
law or rules, don't use a comma between the penultimate and the
last item of a series."  <u>Maine Legislative Drafting Manual</u> 113
(Legislative Council, Maine State Legislature 2009),
http://maine.gov/legis/ros/manual/Draftman2009.pdf ("Drafting
Manual"); <u>see also</u> <u>Jacob</u> v. <u>Kippax</u>, 10 A.3d 1159, 1166 (Me.
2011) (invoking the Drafting Manual to help resolve a statutory
ambiguity).  In fact, Oakhurst notes, Maine statutes invariably
omit the serial comma from lists.  And this practice reflects a
drafting convention that is at least as old as the Maine wage
and hour law, even if the drafting manual itself is of more
recent vintage.  <u>See, e.g.</u>, Me. Stat. tit. 26, § 663(3)(G)

- 10 -

(1965) ("processing, canning or packing"); Me. Stat. tit. 26, §
665(1) (1965) ("hours, total earnings and itemized deductions").

**B.**

If no more could be gleaned from the text, we might be
inclined to read Exemption F as Oakhurst does. But, the
delivery drivers point out, there is more to consider. And
while these other features of the text do not compel the
drivers' reading, they do make the exemption's scope unclear, at
least as a matter of text alone.

The drivers contend, first, that the inclusion of both
"shipment" and "distribution" to describe "packing" results in
no redundancy. Those activities, the drivers argue, are each
distinct. They contend that "shipment" refers to the
outsourcing of the delivery of goods to a third-party carrier
for transportation, while "distribution" refers to a seller's
in-house transportation of products directly to recipients. And
the drivers note that this distinction is, in one form or
another, adhered to in dictionary definitions. See New Oxford
English American Dictionary 497, 1573-74 (2001); Webster's Third
New International Dictionary 666, 2096 (2002).

Consistent with the drivers' contention, Exemption F
does use two different words ("shipment" and "distribution")
when it is hard to see why, on Oakhurst's reading, the
legislature did not simply use just one of them twice. After

- 11 -

all, if "distribution" and "shipment" really do mean the same
thing, as Oakhurst contends, then it is odd that the legislature
chose to use one of them ("shipment") to describe the activity
for which "packing" is done but the other ("distribution") to
describe the activity itself.

The drivers' argument that the legislature did not
view the words to be interchangeable draws additional support
from another Maine statute. That statute clearly lists both
"distribution" and "shipment" as if each represents a separate
activity in its own right. See 10 M.R.S.A. § 1476 (referring to
"manufacture, distribution or shipment"). And because Maine law
elsewhere treats "shipment" and "distribution" as if they are
separate activities in a list, we do not see why we must assume
that the Maine legislature did not treat them that way here as
well. After all, the use of these two words to describe
"packing" need not be understood to be wasteful. Such usage
could simply reflect the legislature's intention to make clear
that "packing" is exempt whether done for "shipment" or for
"distribution" and not simply when done for just one of those
activities.[3]

---

[3] We also note that there is some reason to think that the
distinction between "shipment" and "distribution" is not merely
one that only a lawyer could love. Oakhurst's own internal
organization chart seems to treat the two as if they are
separate activities.

Next, the drivers point to the exemption's grammar. The drivers note that each of the terms in Exemption F that indisputably names an exempt activity -- "canning, processing, preserving," and so forth on through "packing" -- is a gerund. By, contrast, "distribution" is not. And neither is "shipment." In fact, those are the only non-gerund nouns in the exemption, other than the ones that name various foods.

Thus, the drivers argue, in accord with what is known as the parallel usage convention, that "distribution" and "shipment" must be playing the same grammatical role -- and one distinct from the role that the gerunds play. See The Chicago Manual of Style § 5.212 (16th ed. 2010) ("Every element of a parallel series must be a functional match of the others (word, phrase, clause, sentence) and serve the same grammatical function in the sentence (e.g., noun, verb, adjective, adverb)."). In accord with that convention, the drivers read "shipment" and "distribution" each to be objects of the preposition "for" that describes the exempt activity of "packing." And the drivers read the gerunds each to be referring to stand-alone, exempt activities -- "canning, preserving . . . ."

By contrast, in violation of the convention, Oakhurst's reading treats one of the two non-gerunds ("distribution") as if it is performing a distinct grammatical

function from the other ("shipment"), as the latter functions as
an object of a preposition while the former does not. And
Oakhurst's reading also contravenes the parallel usage
convention in another way: it treats a non-gerund (again,
"distribution") as if it is performing a role in the list --
naming an exempt activity in its own right -- that gerunds
otherwise exclusively perform.[4]

---

[4] We note that the other Maine statutory list that uses
these same two words -- "distribution" and "shipment" -- does
assign each of them the same grammatical function. See 10
M.R.S.A. § 1476(2)(A)(3) (referring to "manufacture,
distribution or shipment"). And when the Maine legislature has
elsewhere listed the activity of "distribution" alongside other
activities that appear in the gerund form, it has used the
gerund "distributing." See, e.g., 9 M.R.S.A. § 5003(5) ("for
purposes of raising and distributing money"); 10 M.R.S.A. §
9021(1) ("business of manufacturing, brokering, distributing,
selling, installing or servicing manufactured housing"); 32
M.R.S.A. § 13702-A(24) ("dispensing, delivering or distributing
prescription drugs").

Oakhurst did point out at oral argument that there are
provisions of Maine labor law in which a single noun is included
at the end of a list predominately comprised of gerunds. But
none of the provisions that Oakhurst points to have the unique
structure that Exemption F would have under Oakhurst's reading,
in which a contested term is grammatically parallel with some
list items but not others, and yet is used, as Oakhurst
contends, to serve a different grammatical function than the
term to which it is parallel. Instead, Oakhurst's examples are
of more garden-variety lists. See, e.g., 26 M.R.S.A §
1043(1)(A)(1) (referencing "the raising, shearing, feeding,
caring for, training and management of" various animals); id. at
§ 1043(1)(A)(4) (referencing "hatching or processing of poultry,
transportation of poultry; grading of eggs or packing of eggs,
transportation of eggs; the processing of any meat product or
the transportation of any meat product"). Moreover, the
provisions that Oakhurst cites are not ambiguous as to whether
the non-gerund terms are in fact stand-alone list items. The

- 14 -

Finally, the delivery drivers circle back to that missing comma. They acknowledge that the drafting manual advises drafters not to use serial commas to set off the final item in a list -- despite the clarity that the inclusion of serial commas would often seem to bring. But the drivers point out that the drafting manual is not dogmatic on that point. The manual also contains a proviso -- "Be careful if an item in the series is modified" -- and then sets out several examples of how lists with modified or otherwise complex terms should be written to avoid the ambiguity that a missing serial comma would otherwise create. See Drafting Manual at 114.

Thus, the drafting manual's seeming -- and, from a judge's point of view, entirely welcome -- distaste for ambiguous lists does suggest a reason to doubt Oakhurst's insistence that the missing comma casts no doubt on its preferred reading. For, as the drivers explain, the drafting manual cannot be read to instruct that the comma should have been omitted here if "distribution" was intended to be the last item in the list. In that event, the serial comma's omission would give rise to just the sort of ambiguity that the manual

---

provisions Oakhurst references are unambiguous, so the principle of parallel construction -- an aid to resolving statutory ambiguities -- would never come into play with respect to those provisions.

warns drafters not to create.[5]

Still, the drivers' textual points do not account for what seems to us to be Oakhurst's strongest textual rejoinder: no conjunction precedes "packing." Rather, the only conjunction in the exemption -- "or" -- appears before "distribution." And so, on the drivers' reading, the list is strangely stingy when it comes to conjunctions, as it fails to use one to mark off the

---

[5] For related reasons, the consistent omission of serial commas in the various other statutory lists that Oakhurst points to is not all that probative. None of Oakhurst's examples are of lists in which the missing comma creates an ambiguity as to what the final list item is. Thus, the omission of the serial comma in those lists does not show the legislature would have omitted the comma in this list, as the omission of the comma from this list does create an ambiguity.

Before leaving our discussion of serial commas, we would be remiss not to note the clarifying virtues of serial commas that other jurisdictions recognize. In fact, guidance on legislative drafting in most other states and in the Congress appears to differ from Maine's when it comes to serial commas. Some state legislative drafting manuals expressly warn that the absence of serial commas can create ambiguity concerning the last item in a list. One analysis notes that only seven states -- including Maine -- either do not require or expressly prohibit the use of the serial comma. See Amy Langenfeld, Capitol Drafting: Legislative Drafting Manuals in the Law School Classroom, 22 Perspectives: Teaching Legal Res. & Writing 141, 143-144 (2014); see also Grace E. Hart, Note, State Legislative Drafting Manuals and Statutory Interpretation, 126 Yale L.J. 438 (2016). Also, drafting conventions of both chambers of the federal Congress warn against omitting the serial comma for the same reason. See U.S. House of Representatives Office of the Legislative Counsel, House Legislative Counsel's Manual on Drafting Style, No. HLC 104-1, § 351 at 58 (1995) (requiring a serial comma to "prevent[] any misreading that the last item is part of the preceding one"); U.S. Senate Office of the Legislative Counsel, Legislative Drafting Manual § 321(c) at 79 (1997) (same language as House Manual).

last listed activity.

To address this anomaly, the drivers cite to Antonin Scalia & Bryan Garner, <u>Reading Law: The Interpretation of Legal Texts</u> (2012), in which the authors observe that "[s]ometimes drafters will omit conjunctions altogether between the enumerated items [in a list]," in a technique called "asyndeton," <u>id.</u> at 119. But those same authors point out that most legislative drafters avoid asyndeton. <u>Id.</u> And, the delivery drivers do not provide any examples of Maine statutes that use this unusual grammatical device. Thus, the drivers' reading of the text is hardly fully satisfying.[6]

## IV.

The text has, to be candid, not gotten us very far.

---

[6] The drivers do also contend that their reading draws support from the noscitur a sociis canon, which "dictates that words grouped in a list should be given related meaning." <u>Dole v. United Steelworkers of Am.</u>, 494 U.S. 26, 36 (1990) (citation omitted). In particular, the drivers contend that distribution is a different sort of activity than the others, nearly all of which entail transforming perishable products to less perishable forms -- "canning," "processing," "preserving," "freezing," "drying," and "storing." However, the list of activities also includes "marketing," which Oakhurst argues undercuts the drivers' noscitur a sociis argument. And even if "marketing" does not mean promoting goods or services, as in the case of advertising, and means only "to deal in a market," <u>see</u> <u>Webster's Third New International Dictionary of the English Language</u> 1383 (2002); <u>see also</u> <u>id.</u> (providing additional definitions, including "to go to market to buy or sell" and "to expose for sale in a market"), it is a word that would have at least some potential commonalities with the disputed word, "distribution." For that reason, this canon adds little insight beyond that offered by the parallel usage convention.

We are reluctant to conclude from the text alone that the
legislature clearly chose to deploy the nonstandard grammatical
device of asyndeton. But we are also reluctant to overlook the
seemingly anomalous violation of the parallel usage canon that
Oakhurst's reading of the text produces. And so -- there being
no comma in place to break the tie -- the text turns out to be
no clearer on close inspection than it first appeared. As a
result, we turn to the parties' arguments about the exemption's
purpose and the legislative history. See Berube v. Rust Eng'g,
668 A.2d 875, 877 (Me. 1995) ("Our purpose in construing a
statute is to give effect to the legislative intent as indicated
by the statute's plain language, and we examine other indicia of
legislative intent, such as its legislative history, only when
the plain language is ambiguous.").

### A.

Oakhurst contends that the evident purpose of the
exemption strongly favors its reading. The whole point of the
exemption, Oakhurst asserts (albeit without reference to any
directly supportive text or legislative history), is to protect
against the distorting effects that the overtime law otherwise
might have on employer decisions about how best to ensure
perishable foods will not spoil. See O'Connor v. Oakhurst
Dairy, No. 2:14-CV-192-NT, 2016 WL 1179252, at *5 (D. Me. Jan.
26, 2016) (Magistrate Judge's conclusion that "the purpose of

- 18 -

the exemption for employees engaged in the production and
distribution of perishable foods can only be to achieve the most
efficient possible production and delivery given the nature of
the product"). And, Oakhurst argues, the risk of spoilage posed
by the distribution of perishable food is no less serious than
is the risk of spoilage posed by the other activities regarding
the handling of such foods to which the exemption clearly does
apply.

Oakhurst then goes on to argue that legislative
history supports this supposition about what the legislature
must have intended in crafting the exemption. Oakhurst points
out that the overtime law, which was enacted in 1965, piggybacks
on the definition of "employee" set forth in the wage and hour
law, which had been enacted four years earlier. Oakhurst then
notes that this pre-existing definition of "employee" contained
a carve-out that excluded workers involved in the handling of
"aquatic forms of animal and vegetable life" but that in all
other respects looks a lot like what became Exemption F. In
particular, that carve-out applied to workers "employ[ed] in
loading, unloading or packing . . . for shipment or in
propagating, processing (other than canning), marketing,
freezing, curing, storing or distributing" various "aquatic
forms of animal and vegetable life." P.L. 1961, ch. 277, §
3(F).

Oakhurst thus argues that Exemption F clearly was intended to expand upon the existing carve-out by adding activities (such as "canning") and goods (namely, meats, vegetables, and "perishable foods" more generally). And, for that reason, Oakhurst contends that it makes no sense to read Exemption F, as the delivers drivers do, to have deleted an activity -- "distributing" -- that the carve-out had included.

**B.**

We are not so sure. Any analysis of Exemption F that depends upon an assertion about its clear purpose is necessarily somewhat speculative. Nothing in the overtime law's text or legislative history purports to define a clear purpose for the exemption.

Moreover, even if we were to share in Oakhurst's speculation that the legislature included the exemption solely to protect against the possible spoilage of perishable foods rather than for some distinct reason related, perhaps, to the particular dynamics of certain labor markets, we still could not say that it would be arbitrary for the legislature to exempt "packing" but not "distributing" perishable goods. The reason to include "packing" in the exemption is easy enough to conjure. If perishable goods are not packed in a timely fashion, it stands to reason that they may well spoil. Thus, one can imagine the reason to ensure that the overtime law creates no

incentives for employers to delay the packing of such goods. The same logic, however, does not so easily apply to explain the need to exempt the activity of distributing those same goods. Drivers delivering perishable food must often inevitably spend long periods of time on the road to get the goods to their destination. It is thus not at all clear that a legal requirement for employers to pay overtime would affect whether drivers would get the goods to their destination before they spoiled. No matter what delivery drivers are paid for the journey, the trip cannot be made to be shorter than it is.

Of course, this speculation about the effect that a legal requirement to pay overtime may or may not have on increasing the risk of food spoilage is just that. But such speculation does make us cautious about relying on what is only a presumed legislative purpose to generate a firm conclusion about what the legislature must have intended in drafting the exemption.

Moreover, insofar as the legislative history does shed light on that purpose, it hardly supports Oakhurst's account in any clear way. Significantly, Exemption F does not simply copy the language from the carve-out in the 1961 definition of "employee" that bears on whether "distribution" is an exempt activity. Instead, the legislature made some seemingly significant changes to the language of that carve-out -- changes

that Oakhurst overlooks.

The relevant language in the 1961 definition of "employee" reads: "employment in the . . . packing of such products for shipment" and "in . . . distributing" the products. By using two prepositions, "for" and "in," the text of that carve-out clearly separated the activities of packing products for shipment and of distributing those products, with the consequence that each activity was plainly excluded from the definition of "employee." Exemption F, however, deletes the second preposition, "in," and thereby strips the new language of the clarity of the old with respect to whether the activity of "distribution" is a stand-alone exempt activity or not. And Exemption F also changes the word "distributing" to the word "distribution," and thereby makes the activity of "distribution" parallel in usage to "shipment," which, of course, modifies the exempt activity of packing and does not name an exempt activity on its own.

If Oakhurst's understanding of the legislative history were right, then there would have been no reason for the legislature to have made these revisions. After all, these revisions change the old language in ways that only serve to sow doubt as to whether the activity of "distributing" that plainly had been excluded from the definition of "employee" was intended to name a standalone, exempt activity in Exemption F.

Moreover, the legislature actually revised the 1961 definition of "employee" just months after enacting the overtime law and thus Exemption F.   And the legislature made that revision in a manner that runs contrary to Oakhurst's account. For while the 1961 version of the definition of "employee" excluded workers engaged in "packing . . . for shipment" and "in . . . distributing" "aquatic animal and vegetable life" products, see Me. Laws 1961, c. 277, § 3(F), the revised version removed the reference to "distributing" altogether, see Me. Laws 1965, c. 410, § 663(3)(G).  The result was thus to draw the very distinction between those workers who were engaged in packing products and those workers who were engaged in distributing them that Oakhurst contends we should presume the legislature could not possibly have intended to make in crafting Exemption F.

Of course, Exemption F, unlike this revised version of the carve-out from the definition of "employee," refers not just to "packing," or even just to "packing for shipment."  It refers to "packing for shipment or distribution."  But if Exemption F is indeed modeled on the 1961 definition of "employee" -- as Oakhurst contends -- then we would expect Exemption F at least to use the gerund form of the word "distribution" in referring to that activity.  That is the form that the legislature used in the exemption from the earlier definition of "employee" and that the legislature has used to refer to all the other exempt

activities in Exemption F.

### C.

To be clear, none of this evidence is decisive either way. It does highlight, however, the hazards of simply assuming -- on the basis of no more than supposition about what would make sense -- that the legislature could not have intended to craft Exemption F as the drivers contend that the legislature crafted it. Thus, we do not find either the purpose or the legislative history fully clarifying. And so we are back to where we began.

### V.

We are not, however, without a means of moving forward. The default rule of construction under Maine law for ambiguous provisions in the state's wage and hour laws is that they "should be liberally construed to further the beneficent purposes for which they are enacted." Dir. of Bureau of Labor Standards v. Cormier, 527 A.2d 1297, 1300 (Me. 1987). The opening of the subchapter of Maine law containing the overtime statute and exemption at issue here declares a clear legislative purpose: "It is the declared public policy of the State of Maine that workers employed in any occupation should receive wages sufficient to provide adequate maintenance and to protect their health, and to be fairly commensurate with the value of the services rendered." 26 M.R.S.A. § 661. Thus, in accord with

*Cormier*, we must interpret the ambiguity in Exemption F in light
of the remedial purpose of Maine's overtime statute. And, when
we do, the ambiguity clearly favors the drivers' narrower
reading of the exemption.

Oakhurst counters that this default rule of
construction does not apply when the question concerns whether a
wage and hour law means to create an exemption at all. Rather,
Oakhurst argues, the rule applies only when the issue concerns
the scope of an exemption that does exist. *See, e.g.,* *Marsuq* v.
*Cadete Enters.,* 807 F.3d 431, 438 (1st Cir. 2015) ("The burden
is on the employer to prove an exemption from the FLSA's
requirements, and the remedial nature of the statute requires
that [its] exemptions be narrowly construed against the
employers seeking to assert them." (alteration in original)
(citation omitted)); *Connelly* v. *Franklin Mem. Hosp.,* 1993 Me.
Super. LEXIS 243, *3 (Me. Super. Ct. Oct. 1, 1993) ("[An]
exemption from overtime pay requirements is construed narrowly,
with employers claiming exemption having the burden of proof
that employees fit plainly and unmistakably within the
exemption."). Thus, Oakhurst contends that the rule has no
application here, as the dispute centers on whether
"distribution" is exempted, and not what constitutes
"distribution."

But we see no basis for so confining the application

of this maxim of Maine law. Cormier did not by terms set forth that limit on the potential application of the rule that it announced. And, in fact, Cormier itself applied the maxim to resolve an ambiguity that did not concern the scope of an exemption at all. Cormier instead applied it to determine whether, for purposes of Maine overtime law, the word "employer" should be construed to treat closely related entities operating under common ownership as a single "employer" under 26 M.R.S.A. § 664(3). 527 A.2d at 1298.

Oakhurst also argues that this default rule of construction applies only when courts apply law to facts and so does not apply to purely legal question about whether "distribution" describes an exempt activity or is an exempt activity that is at issue here. But, in construing "employer," Cormier was not simply making -- as Oakhurst would have it -- a factual judgment as to "whether economic reality and the totality of the factual circumstances supports a finding that multiple companies could be treated as one employer." Rather, Cormier first resolved a purely legal dispute over the meaning of "employer," and it did so with reference to this rule of construction.

Specifically, the defendants in that case were challenging a ruling that various corporate entities and partnership controlled by a single family -- collectively known

as Funtown USA -- constituted a single "employer." 527 A.2d at 1297-99. That designation mattered because it meant that overtime would have to be paid to any employee who worked forty hours a week for Funtown USA as a whole, even if the employee did not work that many hours for any one of Funtown USA's various entities. The defendants contended "that the 'joint employer' concept is foreign to Maine law, and is not set forth or described in any state statute" and thus that "once it is established that the entities are legally distinct and not shams, the inquiry should end." 527 A.2d at 1299.

The Superior Court in Cormier ruled, however, that the term "employer" in the overtime law did encompass the joint-employer concept. Id. And the Maine Law Court agreed, holding that the Superior Court's "balancing of the several factors that resulted in its ultimate conclusion was a logical, coherent and legally sufficient mode of analysis." Id. at 1300. And it was in the course of embracing that legal conclusion regarding the proper resolution of the ambiguous term "employer" that Cormier deployed the canon: "Remedial statutes should be liberally construed to further the beneficent purposes for which they are enacted." Id.

To be sure, once Cormier answered the legal question about the meaning of "employer" under § 664(3), Cormier did go on to apply law to fact. In particular, Cormier analyzed

whether the particular legal entities at issue in the case were in fact properly characterized as constituting a "joint employer" given their ties to one another. Id. at 1301-02. But there is no indication that, in concluding that the various entities that comprised "Funtown USA" were in fact a joint employer, id. at 1297-98, Cormier held that that the rule of liberal construction may be deployed only to resolve questions pertaining to the application of law to fact.

Because Cormier does not state the rule of liberal construction as if it is one that may be used to resolve only some ambiguities in Maine's wage and hour laws, and because Cormier itself applies the rule to resolve a purely legal question, we see no basis for concluding that we are free to ignore this rule of construction in resolving the ambiguity that we confront. Thus, notwithstanding the opacity of the text and legislative history, we do not believe certification of a question regarding the proper resolution of the ambiguity in Exemption F would be the appropriate course. See Maurice v. State Farm Mut. Auto. Ins. Co., 235 F.3d 7, 10 (1st Cir. 2000) ("Our practice . . . has been to refrain from certification of state-law issues when we can discern without difficulty the course that the state's highest court likely would follow."). Rather, in accord with Cormier, we adopt the delivery drivers' reading of the ambiguous phrase in Exemption F, as that reading

furthers the broad remedial purpose of the overtime law, which is to provide overtime pay protection to employees.

Given that the delivery drivers contend that they engage in neither packing for shipment nor packing for distribution, the District Court erred in granting Oakhurst summary judgment as to the meaning of Exemption F. If the drivers engage only in distribution and not in any of the stand-alone activities that Exemption F covers -- a contention about which the Magistrate Judge recognized possible ambiguity -- the drivers fall outside of Exemption F's scope and thus within the protection of the Maine overtime law.

## VI.

Accordingly, the District Court's grant of partial summary judgment to Oakhurst is **reversed**.